Good morning. May it please the Court, my name is Mike Haig. I represent James Jarrett in this action which comes to you from an order on summary judgment from the District Court of Idaho on cross motions. Ours was denied and the defendant's was granted. So you're not going to settle for a mere remand. You want judgment for your client. I believe on the record of this case. But I understand you're asking for it. Yes, sir. Okay. For the reasons we stated in the brief, I would like to ask the Court. Yesterday afternoon I received a copy of a letter from counsel to the Court attaching a exhibit, for lack of a better term, a chart. And I'm advised by counsel this morning that she received word that the Court was going to entertain that and consider it. Having read it and not knowing whether I'm going to have any opportunity later on to review it, I think it is a Well, I will confess I've never seen it. I say I've got a piece of paper sitting here. Is this what Yes, sir. I didn't see it until I think we take it as an argument prop is what it is. And I think it's an effective argument prop. In any event, it occurs to me that it fairly well graphically lays out, at least in part, our position relative to the terms of the plan itself. And that is that it's our position that the plan in this case, whereas it might have not granted Mr. Jarrett status that he enjoys, it nevertheless does. Counsel, can I ask you something? Yes, sir. Before we lose it or I lose it. There there is something somewhat appealing about your argument that he went to crystal. We had our last name or deal, I believe. Right. And she said, well, the plan, the plan means is that you're too late. Yes, sir. At this point. Why. On what basis in the record would you indicate that he can rely upon what crystal has to say. And what tells us that she has any right to speak for the plan, construe the plan, et cetera, et cetera. Is that too wordy or. No, I think I understand. I don't know that she has authority to construe the plan. But in terms of. But in terms of what in the record do we point out as to the effect of her colloquy. Never mind the effect of what she said. Yes, sir. That's not really my question. I'm trying. Let me just say for the purpose of this question. Yes, sir. Let me assume that the effective was it because of what she said he didn't file his. Form. Form on time. Okay. Let me just assume that because of what she said. What I'm trying to ask is who cares what she said. You know, for example, if he asked the janitor, do you think I should file this form? The janitor said, nah, it's it's too late. That probably wouldn't pass a giggle test. Correct. Probably correct. But he asked crystal. And let's say crystal said that. And I guess my question is, so what? What authority does she have to speak for the plan? Well, it's my understanding that her own affidavit indicates that she was the point person invested by emeritus to deal with employees such as Jarrett. It was her job to do the orientation. She was the one who claims, in fact, says she gave him the forms that he was given on his date of hire. Well, she gave him she gave him a bunch of paper. I understand that. And her job was to hand him the paper and to receive it. Excuse me. And it's my understanding was to receive it. And to receive it. OK. She was she was the office manager. Emeritus Corporation, from James Jarrett's perspective, was the best land retirement home. He's a cook. She's the office representative. She's the one with whom he deals for purposes of what an office manager is. Sometimes what used to be called executive secretaries are called office managers. Yes, sir. You know, there's there's great inflation. There's been title inflation. Yes, sir. Yes, sir. I don't know what it is. I'm asking for the record, though. I mean, she's she she did provide him with the with the package. She says that. Yes, sir. And she says that she did tell him he was too late. I mean, she says that in her affidavit. Yes, sir. But can one bind a plan by what she says? That's my problem. I understand the plan documents. If you have any questions, call this 800 number. Yes, sir. I think one may stop the plan from taking a position inconsistent with the position taken by the individual it put in the position to interface with Mr. Jarrett. Our position relative to Ms. Gordillo is is relative to the notion that if America somehow prevails in its quest to ignore its own definition of the type of the term late enrollee within the plan and incorporate in its stead a statutory definition of late enrollee and thereby accomplish its task of. I'm trying to establish that Jarrett had an enrollment date other than his date of hire. Then we get into Ms. Gordillo. Yes. And that is an estoppel theory. Ms. Gordillo is the appointed individual by America's by the plan. I believe so. Yes, sir. From the record. From the record. And this is in part why Emeritus Corporation is named as a defendant as well. It's in the supplemental excerpts of record at page 251, wherein Emeritus is Emeritus. Emeritus assisted living is the name both of the plan and of the employer itself. And I frankly can't distinguish. And it is the source of funding. And for the life of me, I can't distinguish at the front end whether there is functionally any difference. The plan administrator is an employee of Emeritus Corporation. And collectively, and it's certainly at no control of Mr. Jarrett, it is Ms. Gordillo, who is placed in the role of interface between the employees and the employer for all functions, including specifically in this case by virtue of her own affidavit, dealing with health insurance benefits and how one might apply for them. If you do get around to looking at the illustrative exhibit counsel has submitted to you, I would point out that it is deficient in one respect, and it's a significant respect. Down the left-hand side of the page, we have recitation of some language within the plan, specifically excerpts from the preexisting condition clause, a definition of the term enrollment date, and that's it. On the right-hand side, we jump over to HIPAA or ERISA statutory and regulatory definitions. What is missing from this exhibit and what is missing from the analysis of this case applied by Emeritus, the defendants, is that the plan itself provides a definition of the term late enrollee. For whatever reason, and they certainly weren't compelled to do so, the drafters of this plan put in there an affirmative opt-out provision. Unless the employee takes the affirmative step of signing a document saying he doesn't want insurance, explaining what the consequences of that conduct is, consequences are, then he is not a late enrollee. Well, can he be neither a late enrollee nor an early enrollee, but something in between? Not for the purposes of whether or not he loses his waiting period, and therefore that changes his enrollment date. Somebody may not qualify as a late employee because he didn't sign off affirmatively on something saying I don't want benefits. He didn't sign up for 10 years. Yes, sir. 10 years later he signs up. Yes, sir. Do you draw from that that the enrollment date isn't when he signed up 10 years later, but when he started working for the company? If the employer does not require the employee to do what the employer's plan says it should do, there's nothing stopping Emeritus from saying, Mr. Jarrett, if you don't want the insurance, you must sign this form. They wrote the plan. The answer to the question I ask is yes. Yes, sir. But it's not the absurdity that Emeritus would have you believe. It's only absurdity if Emeritus doesn't follow through and make sure that it keeps in its files for those employees who are not getting onto the plan evidence that they're opting out. It does seem that it's a bigger hurdle. They've assumed for themselves more responsibility than the law requires of them. But as the regulations we've cited in the briefing spell out, HIPAA slash ERISA establishes the most that a plan can require of the employee with respect to preexisting condition. It doesn't mean that there has to be a preexisting condition clause in a policy. They can waive it entirely. Let me pursue that because it's true that they don't have to have that provision. But I'm not sure that I understand why it is that the failure to be a late enrollee automatically means all the time before someone signs up is defined as a waiting period. A waiting period is the period that must pass. And the fact that you choose not to sign up for 10 years, what makes that a waiting period for purposes of the plan? I think that puts too much weight on the parenthetical. Typically, the date employment begins. The parenthetical, I think, is just a descriptive of what I understand the law to be. With respect to late enrollee or, excuse me, waiting period, a waiting period is the period that you must wait before you're allowed to enroll. It loses that status. But you must wait until you're allowed to enroll. Yes, sir. That wouldn't seem to say the time that passes before somebody affirmatively signs up for the plan, that you aren't required to wait. Yes. Well, they certainly could have written the plan that way. I have no quarrel with the notion that they could have written the plan exactly as you're describing. I haven't figured out what says that they haven't. What is it that says a waiting period includes all the time that passes before somebody signs up? Well, the regulation itself is 29 CFR 2590.701-2. The definition, waiting period is the period that must pass before an employee or dependent is eligible to enroll under the terms of a group and health insurance plan. That's the definition. The next sentence goes on to state that if an employee or dependent enrolls as a late enrollee or on a special enrollment date, and we're not dealing with that here, then any period before such late or special enrollment is not a waiting period. The trigger to it not being a waiting period any longer for the purposes of this case is whether or not the employee is a late enrollee. I don't think you can assume the reverse is true. I don't think you can assume that because you're not a late employee, enrollee. Yes, sir. That necessarily any time before the enrollment is a waiting period. And that's really the question I'm posing. And the hypothetical I gave you about the passage of 10 years, just because someone doesn't qualify as a late enrollee under the definition, does that automatically mean that all the time that passes is a waiting period as used here? I don't understand why that would be the case. Because the waiting period isn't some time that must pass. It's time that passed because the employee elected not to sign up. Yes, sir. And I think I hear what you're saying. Both sides to this dispute look at this definition of waiting period. And both sides to this dispute look at the term late enrollee, whether one is or is not. If one is a late enrollee, then that period that passed before they actually enrolled does not qualify as your waiting period any longer. The difference we have, which stands out in fairly stark contrast, I think, if you look at the exhibit council provided yesterday, is what Emeritus looks at is the definition of late enrollee that would have applied in the absence of the definition in the plan itself. And what we look at is the definition of late enrollee that the plan itself put in. And I think that's an important point. I understand. And so you say don't look at what the arrow points to. Look at the definition in the plan. Yes, sir. But the question I ask, even taking that. Yes, sir. Isn't there still some question as to whether or not someone falls within the category of late enrollee as defined by the plan? Does that necessarily mean that all the passage of time prior to the sign-up counts as a waiting period as defined under the plan? For purposes of determining the enrollment date, which is really the problem we're struggling with. Yes, sir. And I think it does. I have no other way to answer your question but by saying yes. Well, that would be, just looking at it the way people do things, that would be a pretty bizarre result for somebody drawing this plan to have planned on. I mean, I think we've got to admit that's a pretty strange thing to have planned on. The plan is not written the best, and maybe we should find out who the drafter was. But the plan's not written as well as it could have been. Yes, sir. And it seems to leave kind of gaps in understanding because when one looks at it, one thinks, well, I understand what a waiting period is. This guy's got 90 days to wait, and that's a waiting period. And if what you say is true, then people in this category are treated better than people in the higher categories who don't get a waiting period because waiting period becomes a real benefit as opposed to a downside. So isn't that what plan administrators are partly designed for is to construe this kind of stuff and say, well, yeah, it's not a perfect world, but here's what we construe the plan means. Isn't that the point of giving discretion to plan administrators because we know it's not a perfect world? I don't believe so, sir. And I think the limit – yes, plan administrators are given great discretion if the drafters of their plans go out and claim it for them. Yeah. Vis-a-vis the prior case that you were discussing. But having drafted the plan, the administrators stuck with the terms of it. Now, granted, in hindsight, I imagine emeritus would have preferred that the drafter of this plan not put the burden on the plan or the employer to go out and get this declination of coverage form. There's certainly no requirement that they do it, but it is nevertheless a requirement that they assumed for themselves when they drafted the plan. Well, it's less of a requirement and more of a condition. Yes, sir. If they want him to have the status, they have to get his signature. Nothing requires them to have him have the status of late enrollee. Yes, sir. It's something that's of benefit to them. If they want it, they go get it. If they don't want it or they don't get it, they don't get it. My comments on that point are directed at the assertion in the briefing that the result that we're arguing for is an absurdity, the absurdity being that a person 10 years down the road could sign up for insurance finally and then claim their enrollment date from their date of hire. It is not an absurdity when one looks at it through the prism of the employer can solve that problem by requiring the employee, when he or she says, no, thank you, I don't want the insurance, to simply sign the declination of coverage form. I just wait until I get really sick, and then I sign up, and my enrollment date is back there, and we look backwards from that date, and I wasn't sick then. And we look forward a few months, and I wasn't sick then. And so I got insurance, retracted. What would the result be, right? In fact, if you accepted what they think is happening here, that's the result he wants. When he got really, really sick, he signed up, and bingo, he gets it. Right? That's not what happened. Well, you're saying it's not what happened, but let's say we assume a certain scenario, or let's make it just a little worse. He's at the doctor's office, and he says, Doctor, I'm having these terrible pains in my chest, and I can't breathe very well. Yes, sir. Let's just say he was saying that for the moment. Under your scenario, he could certainly go down and then sign up, and boom, he's home in life, Flynn, right? Yes, sir. Wait until he's really, really sick, and then he signs up, and he's got the insurance. No waiting period, no nothing. As this plan is written. Yes, sir. You said it's not absurd, and it sounds slightly absurd from the standpoint of what insurance is supposed to be about. Well, only if one assumes that a preexisting condition exclusion is something that must be in every insurance policy. Well, of course it doesn't have to be. ERISA talks in terms of what limitations. But it is in this policy. We know that. Yes, sir. And we know, obviously, it's going to be in most insurance policies. I doubt that very many insurers even think it's called insurance when you get sick and then you pay your premium and start collecting. I doubt that most people even think of that as insurance. So pretty clearly, that's what this policy is about. And you're saying, yeah, but they glitched with this one provision. And so for his purposes, it's not even an insurance policy. It's just cool. I get very sick. I sign up. They start paying me. I pay them $100, and they pay me a million dollars. That's great. But you're saying that's what this plan does. Well, that's not what happened here. He was actually insured. Pretend that is what happened. You'd say that's okay, right? The way they handled it, yes, sir. You would say if my – I'm just trying to get the picture of the analysis. Yes, sir. Your analysis would be if what I said was true, he really was, he actually had a heart attack and just before he went into surgery, he signed the form. That's okay. Yes, sir. And it happens all the time when people are coming out of one group and into another group. Let me add to that hypothetical. Let's say it turns out that the employer came to him more than once with a form and said, here, look, if you're not going to buy the insurance when you're eligible to do it, we want you to sign this form to show that you are a late and early. And he says, I'm not going to sign this stinking form. I'm just not buying the insurance. I'm just not going to sign the form. And they come again, and he says, I'm not going to do it. I'm not signing the damn form. They change the result. So, you know, it's well documented. Ms. – what's her name over there that's taking care of these things, has a log, and she says, on 25 separate occasions, I walked up to the employee with a form, and I asked them to either sign the form or sign up for the insurance. And, again, he refused. As the plan is drafted, sir, I don't think it does. I think the remedy for the employer in that scenario is twofold. Fire him? You discipline him on the one hand, and you go back to the drafter in the plan, and you say, this is unworkable. We've got a critical mass of employees who are not letting us get them into late enrollee status. You can fix it one of two ways. But they wrote it the way they wrote it. Okay. You are to negative numbers. Thank you, sir. Thank you for your patience. May it please the Court. My name is Catherine Bradley, and I'm here on behalf of all of the appellees, including the plan administrator, who is with us today, Mary Short, sitting in the back. The primary issue in this case is plan interpretation. There doesn't appear to be much of a dispute, at least there wasn't at the district court level, about the standard of review. It's clearly abuse of discretion. There is an attempt on appeal to create some sort of conflict. I think that fails on the basis of the cases. He's not a late enrollee as defined by the plan, right? Your Honor. He's not, as the plan defines, late enrollee. He is not one of those. The definition of enrollment date does not rest on the term late enrollee. The issue of late enrollee only – Can I answer my question? Press, I didn't understand your question. Does – He is not a late enrollee as defined by the plan. Yes or no? The plan does require the declination of coverage. He didn't sign a declination of coverage. That is undisputed. So he's not a late enrollee. It's not an issue that the district court needed to reach. The question was yes or no, so he is not a late enrollee. He did not enroll at the first period during which he was eligible. Why can't you answer that question? Because it depends on whether you're looking at the plan or – If he's a late enrollee, here's what happens. He – that did not happen. He is a late enrollee within the definition of HIPAA. He is not a late enrollee within the definition of the plan. Why do I care about the definition of HIPAA if the plan defines it differently? Because there is no link in the plan between the definition of enrollment date and late enrollee. The issue of late enrollee only comes into play if there is a preexisting condition and we need to determine what the appropriate look-forward provision is, whether it's 12 months or 18 months. And because Mr. Jarrett's heart attack – Sorry, you didn't answer Justice Fernandez's question either. You keep hearing questions and answering different questions. Okay. I would like to hear the answer to the question Justice Fernandez asked you. Having now pulled it out with tongues, the answer that he is not a late enrollee for purpose of the plan, having now determined that, despite your worst efforts to admit it, the question now becomes is why does it matter that he is not – that he is a late enrollee for purpose of HIPAA? What difference does the HIPAA definition make? Your Honor, that's precisely where I'd like to go here, and that is why I provided this chart, which is the same chart we used with the district court to help roadmap how this plan was interpreted and why it is consistent with HIPAA. On the left side of the chart is the language from the plan that provides us with the look-back period definition. We look back to see whether he has a pre-existing condition within the six-month period prior to the enrollment date. We've provided at the bottom on the left the definition of enrollment date within the plan. The first day of coverage, or if there is a waiting period, the first day of the waiting period, typically the date employment begins. There is no definition in the plan of waiting period. So under the Hensley case, the plan administrator has discretion to interpret that in a reasonable way. The plan administrator did interpret it in a reasonable way in this case because it's consistent with HIPAA. Okay, so we look at the HIPAA definition of waiting period, which now takes us to the right side of your chart. Correct. The period that must pass before an employee or dependent is eligible to enroll under the terms of a group health plan. If an employee or dependent enrolls as a late enrollee, okay, any period before such late or special enrollment is not a waiting period. But we know this sentence doesn't apply to him because he is not a late enrollee. You've already admitted that. So we just strike this out of your little box here and pretend it doesn't exist because he's not a late enrollee. Your Honor, if I said that he is not a late enrollee within any definition, I misspoke. He is a late enrollee within HIPAA. That definition is consistent with the result reached by this plan administrator. He's not a late enrollee for purposes of the definition of the plan. He is because that, as I said earlier, there is no link in the plan between the late enrollee definition that Mr. Hague is relying upon and the enrollment date definition that is the critical issue in this case. The only time that that late enrollee... I'm going to ask it one more time and then we'll be at the end of it. I'm not going to talk about this anymore. Okay. Is he a late enrollee under the definition of the plan? Yes. Ultimately, you have to conclude he is a late enrollee within the way the plan was construed, not within the specific language that Mr. Hague is... Within the definition of the plan, he is a late enrollee? Within the manner in which this plan was construed. He was determined... You're playing games with words here. You're not being helpful to your client. I don't really think I have anything else to ask you. I mean, you are not answering questions. And, you know, this is not helping your client in the least bit. Your Honor, I apologize. The reason that I have provided this chart is I wanted to give you a road map of... Questions, but I don't think you're being candid. I don't think you're being responsive. And I don't think you're dealing with the issues. I apologize, Your Honor, to the extent... I have a question on a different topic, then. I think we've finished that one. The plans... Well, let's assume for the moment that Crystal can speak for the plan. You don't have to argue whether she can or not yet. Let's say she can. Crystal says to him, if we accept his affidavits, Crystal says to him when he goes to her, within the time that he could sign up, according to your folks, sorry, you're too late, because the plan requires you to sign up before the end of the waiting period, not after. So you're too late. And he says, he's a poor guy, he says, okay, then I can't sign up. Right? Now, why isn't the... Assuming Crystal can speak for the plan, why isn't the plan bound by that representation by its assumed representative? First of all, Your Honor, that issue was not the subject of discovery below because we didn't have any claim that raised that issue below. The sole claim that was raised below was plan interpretation. Crystal's affidavit that was submitted in this case and Mr. Jarrett's affidavits that were submitted are all after the plan administrator rendered her decision. I understand. Crystal did not offer an interpretation of the plan. And Crystal said to him, you can't sign up now because you're too late. And that's what she said to him. If you assume what Mr. Jarrett says is true, that's correct, Your Honor. Her affidavit seems to substantiate that. What's important here is what the documents that Mr. Jarrett received at the time of hire say. The documents he received at the time of hire said, for example, if you wish to enroll, you must do so within 31 days of your eligibility date. Crystal says that means 31 days before your eligibility date. So what's wrong with that? It wasn't reasonable for him to rely upon Crystal in light of the clear language in the enrollment forms. The language says 31 days of your eligibility date. That doesn't sound clear to me. It sounds ambiguous. Does that mean 31 days before or 31 days after? I think it means 31 days after. You think so. But if I said I'll see you at 10 minutes of 8, would you expect me 10 minutes after 8 or 10 minutes before 8? To the extent it was ambiguous. What time would you expect me? 10 minutes to 8 I would expect. I didn't say to. I said of. I'll see you at 10 minutes of 8. Would you expect me 10 minutes before or after 8? Before. So if I say you must do this within 31 days of your eligibility date, would you expect that to be before or after my eligibility date? And since you're going to do you want to give me a different answer, tell me why. Your Honor, to the extent you're suggesting there's an ambiguity there, this was not an issue that was raised below. I'm suggesting there's an ambiguity. Tell me why if there's an ambiguity Crystal wouldn't buy and stop the plan. Because it's clear based on the cases that you need to look at the documents that Mr. Jarrett received. I am. I'm looking at the document. That's what he received. I actually think that there may be an issue with respect to the 1998 benefit summary, which I believe is the one you're looking at. One of them says 60 days. Now I'm looking at one that says 31 days. That's not relevant. They both say the same phraseology. So tell me. With a different period of time. Both of them make it very clear, though, that he had to enroll and that if he had questions about enrollment that he needed to contact the Emeritus 800 number. He didn't have a question. And he came in with this form and said, I'm ready to enroll in Crystal's. I'm sorry you're too late. Your Honor, that is an issue that was not explored in discovery. It was not raised below. It has been raised on appeal for the first time, but it is not an issue that was raised below, briefed or decided by the judge. And? And we think that the evidence, if it had been developed, would show that Crystal did not make this representation. In fact, her affidavit makes pretty clear that she went to him. How could you do it without a trial? That's what he says. Her affidavit says she did make that representation, in fact. No, she makes a conclusion. She doesn't say in her affidavit that she actually told that to Mr. Jarrett. I informed him that he had 90 days from his hire date to complete and return the forms to me. And she followed up with him several times to inquire why he hadn't. Ninety days from his hire date. That would mean she interpreted it of to mean before and so told him. And he says when I went to her after the 90 days, she said, sorry, it's too late. We can't take your form. And, Your Honor, we are at a disadvantage because this really wasn't the subject of discovery below. I thought this was all in the record. I'm sorry. No. There was an estoppel issue raised in the reply on summary judgment. But it was not. We didn't brief it below because it was raised by the plaintiff at the summary judgment reply stage. Yes. And the district court rejected it as lacking fact, factual or legal basis. Yes. We know it doesn't lack a factual and legal basis. We just discussed that. So what should we do then? To the extent you believe estoppel is an issue, it needs to be remanded because there wasn't an opportunity for the parties to conduct discovery on it. I don't believe it's appropriate to remand because I believe the district court properly applied the abuse of discretion standard, determined that the plan administrator's determination was reasonable. It was consistent with HIPAA. The plaintiff's interpretation does lead to an absurd result. And the plan's never been interpreted in that way. What's her absurd result? I'm sorry, Your Honor. What is that absurd result? The absurd result is that an employee could wait until they have a medical condition, five years, ten years. Only if the employer doesn't get the form signed. Only if the employer doesn't follow the plan. Right? What's absurd about that? The problem is that that's not what the plan was intended to do. It's not how the plan has ever been construed. It's what the plan says. It's how it was drafted. It was drafted by the – it was certainly not drafted by Mr. Jarrett. He just came on the scene. He dealt with an employee there who gave him misinformation. He was not asked to sign the normal waiver form. It wasn't his fault. The power of the employer. None of that happened. And now he finds himself in a pickle where he's uninsured. And, you know, is it your purpose to win or is it the purpose to carry out the plan and to make sure that the just thing happens here? They could have gotten a waiver from him. They could have had an employee there who told him correctly what the date is. They could have taken the form from him when he came up and says, here, I want to enroll, rather than rejecting it. Could have done a little better training on the plan on the person who deals day in and day out with employees rather than giving misinformation. Could have been told, yes, we'll accept late forms and buck them up to see whether maybe they're timely at all, rather than rejecting them and saying, go away, we're not even going to take it. That would be to deal with it. That would be service. That would be caring about what the plan is supposed to be about. That is taking care of the health of employees rather than trying to stick to every technicality and trying to avoid doing even what the plan itself calls for. The plan that you all adopted. Your Honor, I would agree with you that this plan could have been better drafted, and perhaps we wouldn't be here today. You're stuck with what you did draft. You're stuck with what you did draft. I accept that, Your Honor. Mr. Jarrett. You're stuck with what the record contains and what your own witness says she did and said, which is entirely consistent with Mr. Jarrett's claims. Now, why don't you, when you leave here, go and counsel your client to just pay up? They can pay up with an opinion or without an opinion. But try to do the right thing for once. Okay? And when you get asked a question by the court, try to give a straight answer. You're an officer of the court, counsel. Do you understand that? Do you understand what that means? I understand that, Your Honor. Go back and you get yourself a tape of this whole argument, and you listen to yourself. And ask whether you've done your reputation or the cause of your client any good, or indeed the cause of justice. Look in the mirror and have a talk with your client. Okay? Let's not lengthen this anymore. You know, making the lawyers rich is not the purpose of these plans. Okay? Thank you, Your Honor. I'd be happy to answer any other questions. Look in the mirror and answer that question. It's just all you will stand submitted.
judges: Kozinski, Fernandez, Clifton